**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PAUL GLANTZ, individually and on behalf of all others similarly situated, | Case No. 1:23-cv-10000-LJL |
| Plaintiff, | **AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| v. | **JURY TRIAL DEMANDED** |
| JAMES RIVER GROUP HOLDINGS, LTD., FRANK N. D'ORAZIO, and SARAH C. DORAN, | |
| Defendants. | |

**TABLE OF CONTENTS**

I.      NATURE OF THE ACTION ................................................................. 1

II.     JURISDICTION AND VENUE .............................................................. 3

III.    PARTIES ............................................................................................... 4

IV.     SUBSTANTIVE ALLEGATIONS ......................................................... 5

        A.      James River's Excess and Surplus Line Had No Effective Internal Controls,

                Resulting in Inaccurate Reporting .......................................................... 5

                1.      Background ................................................................................. 5

                2.      Former James River Employees Described a Dysfunctional Accounting

                        Function and Improper Reserve Practices .................................. 6

        B.      James River Violated GAAP by Improperly Accounting for Reinsurance

                Premiums ............................................................................................... 9

        C.      Restatement and Materiality ................................................................ 15

        D.      James River's Ineffective Internal Controls Over Financial Reporting ............... 19

        E.      False and Misleading Statements During the Class Period ................................. 23

        F.      The Truth Emerges ............................................................................... 26

V.      PLAINTIFF'S CLASS ACTION ALLEGATIONS ........................................ 27

VI.     APPLICATION OF PRESUMPTION OF RELIANCE; FRAUD ON THE

        MARKET ............................................................................................. 29

VII.    COUNTS ............................................................................................... 32

VIII.   PRAYER FOR RELIEF ......................................................................... 36

IX.     DEMAND FOR TRIAL BY JURY ......................................................... 37

1.      Lead Plaintiff Madhav Ghimire ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding the James River Group Holdings, Ltd. ("James River" or "Company"), analysts' reports and advisories about the Company, consultations with experts, interviews with former Company employees, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.     NATURE OF THE ACTION

2.      This is a federal securities class action on behalf of persons and entities that purchased or otherwise acquired James River common stock between May 2, 2023, and November 7, 2023, inclusive (the "Class Period"), seeking to recover compensable damages caused by Defendants' violations of the Securities Exchange Act of 1934 (the "Exchange Act").

3.      On November 7, 2023, after the market closed, James River, a company that owns and operates a group of specialty insurance companies, disclosed in a press release announcing its third quarter 2023 financial results that it had "identified an error in the accounting for reinstatement premium . . . in its Excess & Surplus Lines segment" in the previously issued financial statements for the second quarter of 2023. More, the Company stated, it had identified a material weakness in its internal control over financial reporting because the "Company's control

over the review of the determination of when reinstatement premiums for reinsurance should be recognized did not operate effectively[.]"

4.      Following these disclosures, the Company's stock price fell price fell $5.30, or 37.5%, to close at $8.44 on November 9, 2023, on unusually heavy trading volume.

5.      On November 14, 2023, James River filed an amendment on Form 10 Q/A with the SEC ("Restatement"), restating its financial statements as of June 30, 2023, and for the three and six month periods then ended. The restatement acknowledged that the Company recorded $2.9 million in Q1 2023 reinstatement premiums and $9.4 million in Q2 2023 reinstatement premiums one quarter too late, respectively. As a direct result of these misstatements relating to reinsurance premium, James River had materially overstated numerous results. For example, James River's overstatements of its income before taxes net income and its diluted earnings per share during the second quarter of 2023 each exceeded 40%. More, while the Company described the error in the first quarter of 2023 as "immaterial," it was well in excess of quantitative materiality threshold of 5% in relation to both income and diluted earnings per share (the latter, in excess of 50%).

6.      The Restatement also addressed James River's internal controls that the Company had previously described as effective. Certain of the Company's reinsurance treaties include a requirement to pay additional reinsurance premiums after the initial coverage limit has been exhausted. James River disclosed that its control over the review of the determination of when reinstatement premiums for reinsurance should be recognized did not operate effectively as of March 31, 2023, and June 30, 2023, resulting in a material weakness in the Company's internal control over financial reporting. Based on this assessment, James River admitted, the Company's disclosure controls and procedures were ineffective in the first and second quarters of 2023. Specifically, the Company recognized reinstatement premiums for reinsurance at the wrong

time. In determining whether it owed reinstatement premium on one of its treaties, the Company found that the liability for the reinstatement premium payable on three claims was recorded in a subsequent quarter of 2023 from the quarter in 2023 when the incurred losses that triggered the reinstatement premiums were recorded. Management's control did not operate as designed to identify that claims incurred on the 2020 and 2021 years of an excess of loss reinsurance treaty resulted in the initial coverage limit being exhausted and the need to record an accrual for reinstatement premium to reflect the cost of additional reinsurance coverage. Instead, claims paid on the reinsured policies were used in the calculation, which indicated that the initial coverage limits had not yet been exhausted.

7.     Indeed, several former James River employees explained that the Company lacked effective controls over its accounting systems as well as its reserve practices.

8.     As the direct and proximate result of Defendants' knowing or reckless wrongdoing, Plaintiff and other Class members suffered damages.

## II.    JURISDICTION AND VENUE

9.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

11.    Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as the alleged misstatements entered the securities markets from this District and the subsequent damages took place in this District.

12.    In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

## III.    PARTIES

13.    Lead Plaintiff, Madhav Ghimire, as set forth in its previously filed PSLRA Certification (Dkt. No. 13-2), acquired James River common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of Defendants' fraud.

14.    Defendant James River is incorporated under the laws of Bermuda with its principal executive offices located in Bermuda. James River's common shares trade on the NASDAQ exchange under the symbol "JRVR."

15.    Defendant Frank N. D'Orazio ("D'Orazio") was the Company's Chief Executive Officer ("CEO") at all relevant times.

16.    Defendant Sarah C. Doran ("Doran") was the Company's Chief Financial Officer ("CFO") at all relevant times.

17.    Defendants D'Orazio and Doran (together, "Individual Defendants") each:

a.    directly participated in the management of the Company;

b.    was directly involved in the day-to-day operations of the Company at the highest levels;

c.    was privy to confidential proprietary information concerning the Company and its business and operations;

d.    was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

e.    was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

    f.   was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company;

    g.   approved or ratified these statements in violation of the federal securities laws; and

    h.   signed false Sarbanes-Oxley Act of 2002 ("SOX") certifications.

## IV.   SUBSTANTIVE ALLEGATIONS

### A.   James River's Excess and Surplus Line Had No Effective Internal Controls, Resulting in Inaccurate Reporting

#### 1.   Background

18.    James River is a Bermuda-based holding company that owns and operates a group of specialty insurance companies. The group includes four reportable segments: Excess and Surplus ("E&S") Lines, Specialty Admitted Insurance, Casual Reinsurance, and Corporate and Other. The majority of the Company's revenue originates from the U.S. Excess and Surplus lines market. The E&S Lines segment offers commercial excess and surplus lines liability and property insurance in every U.S. state, the District of Columbia, Puerto Rico and the U.S. Virgin Islands through James River Insurance Company and its wholly-owned subsidiary, James River Casualty Company.

19.    E&S lines insurance, also known as surplus lines insurance, is a specialty market that covers risks that standard insurance carriers will not underwrite or price. E&S insurance is designed for businesses with high risks that the traditional insurance market will not cover, such as those in construction, building, roofing, and commercial transportation.

20.    James River routinely purchases reinsurance for E&S lines to limit the Company's exposure to potential losses, to protect against the aggregation of several risks in a common loss occurrence, and to provide additional capacity for growth. In a reinsurance transaction, an insurance company (i.e., James River) transfers, or cedes, all or part of its exposure in return for a

portion of the premium. Reinsurance is contracted under excess of loss and quota share reinsurance contracts. In excess of loss reinsurance, the reinsurer agrees to assume all or a portion of the ceding company's losses in excess of a specified amount. The premiums payable to the reinsurer are negotiated by the parties based on their assessment of the risk being ceded to the reinsurer because the reinsurer does not share proportionately in the ceding company's losses. In quota share reinsurance, the reinsurer assumes a specified percentage of the ceding company's losses arising out of a defined class of business in exchange for a corresponding percentage of premiums.

21.    Reinsurance contracts often include a provision to reinstate the initial coverage purchased each time it is used up by a loss. To have the coverage reinstated, the reinsured pays an additional premium amount called a reinstatement premium.

22.    Premiums paid to the reinsurer (ceded written premiums) are presented as a reduction in premium revenue on the Company's income statement. As a result, if a company understates ceded written premiums owed to reinsurers, it will overstate its revenues and appear more profitable than it really is. This is exactly what happened in this case: as a result of James River's false statements related to reinsurance premiums, it materially overstated its reported financial results.

### 2.    Former James River Employees Described a Dysfunctional Accounting Function and Improper Reserve Practices

23.    Former James River employees in diverse functions described an antiquated, barely usable accounting system and reserve practices that demonstrated a lack of effective internal controls at the Company.

24.    Confidential Witness 1 ("CW1")[1], the senior accounting manager at James River

---

[1] CW1 reported to Assistant Controller Morgan Bauserman.

Insurance Company (the Company's E&S line subsidiary) from July 2022 to December 2022 (i.e., shortly before the beginning of the Class Period), explained that James River Insurance Company did not have the right financial systems in place when she was there to produce accurate financial statements. CW1's job included preparing monthly financial statements based on the Company's balance sheet, the income statement, and cash flow. CW1 stated that James River Insurance Company used several different ledger systems instead of just one General Ledger system. As a result, it did not have a single database set with all premium amounts available to its accounting function. CW1 explained that a General Ledger system would pull together all of a company's underwriting data. Without that ability to access all lines of business, financial statements would be incorrect. CW1 left her job after just five months because she believed she was creating inaccurate financial statements.

25.    Confidential Witness 2 ("CW2"), the senior premium auditor for James River Insurance Company from October 2022 to July 2023, described its accounting system as "antiquated and slow." CW2 confirmed CW1's statement that the underwriting data was not connected to the accounting system.

26.    The statements of CW1 and CW2 show that James River lacked internal controls over financial reporting. Because it did not have a General Ledger or a usable, integrated accounting system in general, staff in the finance function were unable to produce accurate financial statements. As a result, James River made materially false financial statements to investors.

27.    Confidential Witness 3 ("CW3") was the New York Labor Law complex claims specialist for James River Insurance Company from September 2022 through March 2023. CW3 initially reported directly to the AVP of complex claims, Praghatee Dhakal ("Dhakal"), and then

to Confidential Witness 4 ("CW4"), who joined James River Insurance Company as claims liability manager in November 2022. CW3 was hired to resolve a backlog of hundreds of New York Labor Law claims. She explained that these were multi-million dollar, several layer exposures, and most had only a $5000 reserve on them when they usually were worth at least $1 million. As a result, CW3 explained, the Company did not adequately reserve for its claims. CW3 stated that Dhakal would often deny claims in bad faith. On one occasion, she spoke directly with the underwriter for a claim after Dhakal denied it, supposedly because there was no coverage, and confirmed that there was coverage. CW3 was then told never to communicate directly with the underwriting function. CW3 believed that James River Insurance Company simply did not have adequate reserves.

28.     CW4 was claims liability manager at James River Insurance Company from November 2022 through March 2024. CW4 reported to Dhakal. CW4's role included overseeing claims examiners and handlers and reviewing coverage, letters, authority, and large loss reports. CW4 confirmed that there was a major backlog of New York Labor Law claims, and many, in her words, were "grossly under reserved." CW4 described the environment at James River Insurance Company as lacking in communication, engagement, and consistency. CW4 also recalled that Dhakal would improperly reject claims, resulting in third-party actions and declaratory judgments against James River Insurance Company.

29.     CW3 and CW4's statements concerning James River Insurance Company's inadequate reserves show that the Company did not have internal controls over its cash flows or the accuracy of its accounting. Even a company that has purchased reinsurance for claims still bears responsibility for paying out claims, and is obligated to accurately account for claims and reserve for unknown claims while recording a receivable for the amounts is believes are due from

reinsurer. This failure of internal controls rendered James River incapable of creating materially accurate financial statements.

**B.     James River Violated GAAP by Improperly Accounting for Reinsurance Premiums**

30.     GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. The SEC Rules and interpretive releases and the Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") represent sources of authoritative GAAP for SEC registrants. (ASC 105-10-05-1) Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

31.     Accounting Standards Codification Topic 944 ("ASC 944"), *Financial Services—Insurance*, is the authoritative accounting standard which governs accounting for reinsurance contracts. ASC 944 defines reinsurance as "[a] transaction in which a reinsurer (assuming entity), for a consideration (premium), assumes all or part of a risk undertaken originally by another insurer (ceding entity)." ASC 944-20-20.

32.     "An insurance entity may purchase reinsurance to reduce exposure to losses from the events it has agreed to insure, similar to a direct insurance contract purchased by an individual or noninsurance entity. The insurance entity also may contract with a reinsurer to facilitate the writing of contracts larger than those normally accepted, to obtain or provide assistance in entering new types of business, or to accomplish tax or regulatory objectives." ASC 944-20-05-39A.

33.    "Insurance provides indemnification against loss or liability from specified events and circumstances that may occur or be discovered during a specified period. In exchange for a payment from the policyholder, an insurance entity agrees to pay the policyholder if specified events occur or are discovered. Similarly, the insurance entity may obtain indemnification against claims associated with contracts it has written by entering into a reinsurance contract with another insurance entity (the reinsurer or assuming entity). The insurer (or ceding entity) pays (cedes) an amount to the reinsurer, and the reinsurer agrees to reimburse the insurer for a specified portion of claims paid under the reinsured contracts. However, the policyholder usually is unaware of the reinsurance arrangement, and the insurer ordinarily is not relieved of its obligation to the policyholder. The reinsurer may, in turn, enter into reinsurance contracts with other reinsurers, a process known as retrocession." ASC 944-20-05-40.

34.    ASC 944 requires insurance companies to disclose, either on the income statement or in the notes to the financial statements, the amounts of premiums from direct business and reinsurance premiums ceded (on both a written basis and an earned basis) and recoveries recognized under reinsurance contracts. ASC 944-605-45-1 and ASC 944-605-50-1. Premiums paid to the reinsurers are presented as a reduction in premium revenues attributable to direct insurance written. The reinsurance benefit is presented as a reduction in claims expense.

35.    "Many short-duration insurance and reinsurance contracts have retrospective rating provisions. A retrospectively rated contract is a multiple-year contract in which events in one period of the contract create rights and obligations in another. For example, if losses above a certain level occur in one contract year, premiums increase in future years unless the ceding entity compensates the reinsurer through a settlement adjustment. The ceding entity has an obligation

because it must pay either the settlement adjustment or the higher future premiums." ASC 944-20-05-41.

36.    ASC 944 requires the ceding entity to recognize a liability "to the extent that the ceding entity has an obligation to pay cash (or other consideration) to the reinsurer that would not have been required absent experience under the contract (for example, payments that would not have been required if losses had not been experienced)." ASC 944-20-25-4. Upon a loss event when the reinstatement premium is obligatory, the ceding insurer recognizes a liability to the extent that the ceding insurer has an obligation to pay cash or other consideration to the reinsurer that would not have been required absent the loss experience to date. Additionally, the cedant recognizes the entire additional reinstatement premium as an immediate expense, as it is an obligatory payment that would not have been required absent losses under the contract.

37.    In its November 8, 2023, Form 8-K, James River acknowledged that "[c]ertain of the Company's reinsurance treaties include a requirement to pay additional reinsurance premiums after the initial coverage limit has been exhausted." [2]

38.    The Company admitted that "[i]n determining whether the Company owed reinstatement premium on one of its treaties, the Company found that the liability for the reinstatement premium payable on three claims was recorded in a subsequent quarter of 2023 from the quarter in 2023 when the incurred losses that triggered the reinstatement premiums were recorded. … A similar error occurred in the three months ended March 31, 2023 … ."

39.    This improper accounting materially impacted the Company's financial statements. GAAP requires any error in the financial statements of a prior period discovered after the financial

---

[2] A treaty contract automatically covers (attaches) direct contracts with specific characteristics when the underlying direct policy is issued.

statements are issued to be reported as an error correction by restating the prior-period financial statements and providing description of the nature of the error and its effect on the financial statements. ASC 250-10-45-23 and ASC 250-10-50-7. Because GAAP does not apply to immaterial items (ASC 105-10-05-6), a restatement is required only for items deemed to be material. Accordingly, James River has admitted that it issued materially misstated financial statements, which materially misled investors concerning the Company's financial results.

40.    In a Form 8-K filed on November 8, 2023, the Company stated:

**Item 4.02 Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**

(a) In preparing its Quarterly Report on Form 10-Q for the period ended September 30, 2023, management of the Company identified an **error in the accounting for reinstatement premium on a specialty casualty reinsurance treaty in its Excess & Surplus Lines segment (the "Reinstatement Premium") in the Company's previously issued condensed consolidated financial statements as of and for the three and six months ended June 30, 2023 (the "Prior Financial Statements"). Certain of the Company's reinsurance treaties include a requirement to pay additional reinsurance premiums after the initial coverage limit has been exhausted. In determining whether the Company owed reinstatement premium on one of its treaties, the Company found that the liability for the reinstatement premium payable on three claims was recorded in a subsequent quarter of 2023 from the quarter in 2023 when the incurred losses that triggered the reinstatement premiums were recorded. This error resulted in understatements of ceded written premium, and overstatements of net written premium and net earned premium of $9.4 million and $12.3 million for the three and six months ended June 30, 2023, respectively, and overstatements of net income of $7.8 million and $10.4 million for the three and six months ended June 30, 2023, respectively, within the condensed consolidated statements of income and comprehensive income (loss), as well as corresponding effects on the condensed consolidated balance sheet and condensed consolidated statements of changes in shareholders' equity as of and for the three and six months ended June 30, 2023 in the original Quarterly Report on Form 10-Q for such period filed with the U.S. Securities and Exchange Commission on August 8, 2023 (the "Original Filing"). A similar error occurred in the three months ended March 31, 2023, which was deemed immaterial.**

Due to this error, on November 7, 2023, the Audit Committee of the Board of Directors of the Company, after considering the recommendation of management and discussion with its independent registered public accounting firm, Ernst & Young LLP ("EY"), concluded that **the Prior Financial Statements included in**

**the Original Filing should no longer be relied upon solely as a result of the above-described error in the accounting for the Reinstatement Premium and will require restatement.** Similarly, any previously issued or filed reports, related earnings releases, investor presentations or similar communications of the Company describing the Prior Financial Statements should no longer be relied upon.

The Company's management has assessed the effect of the foregoing on the Company's internal control over financial reporting and disclosure controls and procedures. **The Company's control over the review of the determination of when reinstatement premiums for reinsurance should be recognized did not operate effectively as of March 31, 2023 and June 30, 2023 resulting in a material weakness in the Company's internal control over financial reporting. Based on this assessment, the Company's disclosure controls and procedures were ineffective in the first and second quarter of 2023.**

The Company intends to file a Form 10-Q/A for the three and six months ended June 30, 2023 (the "Amended Report") and intends to include restated financial statements as of and for the three and six months ended June 30, 2023 with the Amended Report. The Company intends to file the Amended Report concurrently with or shortly before its Quarterly Report on Form 10-Q for the three and nine months ended September 30, 2023.

(Emphasis added.)

41.     In the Restatement, James River disclosed the impact of recording the liability resulting from losses that triggered the reinstatement premiums in the incorrect period:

| ($ in thousands, except EPS) | | Three Months Ended | | | | Six Months Ended | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | Q1 2023 | | Q2 2023 | | June 30, 2023 | |
| **Total revenues** | | | | | | | |
| Originally reported | $ | 235,601 | $ | 238,442 | $ | 474,043 | |
| Error in recording ceded written premiums | | (2,930) | | (9,391) | | (12,321) | |
| Restated | $ | 232,671 | $ | 229,051 | $ | 461,722 | |
| *Overstated by* | | *1.3%* | | *4.1%* | | *2.7%* | |
| **Income before taxes** | | | | | | | |
| Originally reported | $ | 12,744 | $ | 31,014 | $ | 43,758 | |
| Error in recording ceded written premiums | | (2,930) | | (9,391) | | (12,321) | |
| Restated | $ | 9,814 | $ | 21,623 | $ | 31,437 | |
| *Overstated by* | | *29.9%* | | *43.4%* | | *39.2%* | |
| **Net income** | | | | | | | |
| Originally reported | $ | 9,608 | $ | 23,693 | $ | 33,301 | |
| Error in recording ceded written premiums | | (2,602) | | (7,779) | | (10,381) | |
| Restated | $ | 7,006 | $ | 15,914 | $ | 22,920 | |
| *Overstated by* | | *37.1%* | | *48.9%* | | *45.3%* | |
| **Net income available to common shareholders** | | | | | | | |
| Originally reported | $ | 6,983 | $ | 21,068 | $ | 28,051 | |
| Error in recording ceded written premiums | | (2,602) | | (7,779) | | (10,381) | |
| Restated | $ | 4,381 | $ | 13,289 | $ | 17,670 | |
| *Overstated by* | | *59.4%* | | *58.5%* | | *58.7%* | |
| **EPS (diluted)** | | | | | | | |
| Originally reported | $ | 0.18 | $ | 0.54 | $ | 0.74 | |
| Error in recording ceded written premiums | | (0.07) | | (0.19) | | (0.27) | |
| Restated | $ | 0.12 | $ | 0.35 | $ | 0.47 | |
| *Overstated by* | | *59.4%* | | *54.3%* | | *57.4%* | |

14

| ($ in thousands) | | March 31, 2023 | | June 30, 2023 |
|---|---|---|---|---|
| **Payable to reinsurers** | | | | |
| Originally reported | $ | 139,934 | $ | 170,004 |
| Error in recording ceded written premiums | | 2,930 | | 12,321 |
| Restated | $ | 142,864 | $ | 182,325 |
| *Understated by* | | *-2.1%* | | *-6.8%* |
| | | | | |
| **Total liabilities** | | | | |
| Originally reported | $ | 4,469,274 | $ | 4,555,049 |
| Error in recording ceded written premiums | | 2,930 | | 10,381 |
| Restated | $ | 4,472,204 | $ | 4,565,430 |
| *Understated by* | | *-0.1%* | | *-0.2%* |
| | | | | |
| **Retained deficit** | | | | |
| Originally reported | $ | (146,993) | $ | (127,844) |
| Error in recording ceded written premiums | | (2,602) | | (10,381) |
| Restated | $ | (149,595) | $ | (138,225) |
| *Understated by* | | *-1.7%* | | *-7.5%* |
| | | | | |
| **Total shareholders' equity** | | | | |
| Originally reported | $ | 590,915 | $ | 595,923 |
| Error in recording ceded written premiums | | (2,602) | | (10,381) |
| Restated | $ | 588,313 | $ | 585,542 |
| *Overstated by* | | *0.4%* | | *1.8%* |

C.      **Restatement and Materiality**

42.     GAAP requires any error in the financial statements of a prior period discovered after the financial statements are issued to be reported as an error correction by restating the prior-period financial statements and providing description of the nature of the error and its effect on the financial statements. ASC 250-10-45-23 and ASC 250-10-50-7.

43.     ASC 250 distinguishes errors from accounting changes and defines an error as "an error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of generally accepted accounting principles (GAAP), or oversight or misuse of facts that existed at the time the financial statements

were prepared. A change from an accounting principle that is not generally accepted to one that is generally accepted is a correction of an error." ASC 250-10-20 – Glossary.

44.     ASC 250 states that if a company must correct a prior period error, it should do so by restating the prior-period financial statements including the following:

a.  The cumulative effect of the error on periods prior to those presented shall be reflected in the carrying amounts of assets and liabilities as of the beginning of the first period presented.

b.  An offsetting adjustment, if any, shall be made to the opening balance of retained earnings (or other appropriate components of equity or net assets in the statement of financial position) for that period.

c.  Financial statements for each individual prior period presented shall be adjusted to reflect correction of the period-specific effects of the error.

ASC 250-10-45-23.

45.     ASC 250 further requires disclosure that "previously issued financial statements have been restated, along with a description of the nature of the error", including "the effect of the correction on each financial statement line item… for each prior period presented" and "the cumulative effect of the change on retained earnings …as of the beginning of the earliest period presented." ASC 250-10-50-7.

46.     Because GAAP does not apply to immaterial items (ASC 105-10-05-6), a restatement is required only for items deemed to be material.

47.     In addition, Item 4.02 of Form 8-K requires specific disclosures when "the registrant's board of directors …concludes that any previously issued financial statements …should no longer be relied upon because of an error in such financial statements."

48.     FASB's Statements of Financial Accounting Concepts No. 8 ("CON 8") states the following:

The omission or misstatement of an item in a financial report is material if, in light of surrounding circumstances, the magnitude of the item is such that it is probable

that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item.

CON 8 ¶ QC11.

49.    SEC Staff Accounting Bulletins No. 99 and No. 108 ("SAB 99" and "SAB 108") offer the most comprehensive guidance on the determination of materiality of misstatements of financial statements. SAB 99 brings together guidance from financial accounting standards, auditing standards, and decisions of the United States Supreme Court. SAB 99 addresses misstatements or omission of amounts, classifications, manner of presentation and disclosures in financial statements. SAB 99 provides that the materiality assessment must be based on consideration of all relevant circumstances or the "total mix" of information, including the size of the misstatement and the context in which the user of the financial statements would view the item. The SEC has no objection to using 5% as an initial benchmark in assessing materiality. SAB 99 sets forth the SEC Staff's view that there are circumstances in which misstatements below a percentage threshold (e.g., 5 percent) could be material.

Among the considerations that may well render material a quantitatively small misstatement of a financial statement item are –

- **whether the misstatement arises from an item capable of precise measurement or whether it arises from an estimate and, if so, the degree of imprecision inherent in the estimate**

- whether the misstatement masks a change in earnings or other trends

- whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise

- whether the misstatement changes a loss into income or vice versa

- **whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability**

- whether the misstatement affects the registrant's compliance with regulatory requirements

- whether the misstatement affects the registrant's compliance with loan covenants or other contractual requirements

- whether the misstatement has the effect of increasing management's compensation – for example, by satisfying requirements for the award of bonuses or other forms of incentive compensation

- whether the misstatement involves concealment of an unlawful transaction.

(Emphasis added.) "The shorthand in the accounting and auditing literature for this analysis is that financial management and the auditor must consider both 'quantitative' and 'qualitative' factors in assessing an item's materiality." SAB 99.

50.    The E&S segment was the Company's largest segment. It accounted for 61.5% of James River's gross written premiums and 78.7% of its net written premiums for the year ended December 31, 2022.[3] Thus, a misstatement of financial results of the E&S segment was material to the Company's investors.

51.    James River admitted that the error in accounting for ceded written premiums materially misstated the reported E&S segment net earned premiums, revenues, and underwriting profit for Q1 and Q2 2023:

---

[3] 2022 Form 10-K, pages 5 - 6.

| ($ in thousands) | | Three Months Ended | | | | Six Months Ended |
|---|---|---|---|---|---|---|
| | | Q1 2023 | | Q2 2023 | | June 30, 2023 |
| **Net earned premiums** | | | | | | |
| Originally reported | $ | 151,359 | $ | 159,002 | $ | 310,361 |
| Error in recording ceded written premiums | | (2,930) | | (9,391) | | (12,321) |
| Restated | $ | 148,429 | $ | 149,611 | $ | 298,040 |
| *Overstated by* | | *2.0%* | | *6.3%* | | *4.1%* |
| **E&S segment revenues** | | | | | | |
| Originally reported | $ | 166,650 | $ | 175,521 | $ | 342,171 |
| Error in recording ceded written premiums | | (2,930) | | (9,391) | | (12,321) |
| Restated | $ | 163,720 | $ | 166,130 | $ | 329,850 |
| *Overstated by* | | *1.8%* | | *5.7%* | | *3.7%* |
| **E&S segment underwriting profit** | | | | | | |
| Originally reported | $ | 19,995 | $ | 19,433 | $ | 39,428 |
| Error in recording ceded written premiums | | (2,930) | | (9,391) | | (12,321) |
| Restated | $ | 17,065 | $ | 10,042 | $ | 27,107 |
| *Overstated by* | | *17.2%* | | *93.5%* | | *45.5%* |

52.    James River did not restate its first quarter 2023 financial statements because it deemed the error in those financial statements to be immaterial. Although the error in the Q1 2023 financial statements was smaller than in the second quarter 2023 financial statements, it involved a significant segment and was well in excess of quantitative materiality threshold of 5% in relation to income and EPS. Accordingly, Defendants materially misled investors in their financial reports for both the first and second quarters of 2023.

**D.    James River's Ineffective Internal Controls Over Financial Reporting**

53.    The Committee of Sponsoring Organizations of the Treadway Commission (COSO) Internal Control—Integrated Framework ("Framework") was originally issued in 1992 and refreshed in 2013. The Framework was developed as guidance to help improve confidence in all types of data and information.

54.    The Framework sets forth three categories of objectives, which allow organizations to focus on separate aspects of internal control:

- *Operations Objectives*—These pertain to effectiveness and efficiency of the entity's operations, including operational and financial performance goals, and safeguarding assets against loss.

- *Reporting Objectives*—These pertain to internal and external financial and non-financial reporting and may encompass reliability, timeliness, transparency, or other terms as set forth by regulators, standard setters, or the entity's policies.

- *Compliance Objectives*—These pertain to adherence to laws and regulations to which the entity is subject.

55.    Management, with board oversight, sets entity-level objectives that align with the entity's mission, vision, and strategies. Management and the board of directors establish goals and targets toward the achievement of objectives that by their nature create pressures within the organization. Excessive pressures are most commonly associated with:

- Unrealistic performance targets, particularly for short-term results;

- Conflicting objectives of different stakeholders;

- Imbalance between rewards for short-term financial performance and those for long-term focused stakeholders, such as corporate sustainability goals.

For example, pressure to generate sales levels that are not commensurate with market opportunities can lead sales managers to falsify numbers or engage in bribery or other illicit acts.

56.    Setting objectives is a prerequisite to internal control and a key part of the management process relating to strategic planning.

57.    COSO defines internal control as "a process, effected by an entity's board of directors, management, and other personnel, designed to provide reasonable assurance regarding the achievement of objectives relating to operations, reporting, and compliance."

58.    Internal control is not one event or circumstance, but a dynamic and iterative process— actions that permeate an entity's activities and that are inherent in the way management runs the entity. Embedded within this process are controls consisting of policies and procedures.

These policies reflect management or board statements of what should be done to effect internal control. Such statements may be documented, explicitly stated in other management communications, or implied through management actions and decisions. Procedures consist of actions that implement a policy.

59.     Internal control is effected by the board of directors, management, and other personnel. It is accomplished by the people of an organization, by what they do and say. The board and senior management establish the tone for the organization concerning the importance of internal control and the expected standards of conduct across the entity. The board of directors and senior management establish the tone at the top regarding the importance of internal control including expected standards of conduct. Management reinforces expectations at the various levels of the organization. The resulting control environment has a pervasive impact on the overall system of internal control.

60.     Tone is impacted by the operating style and personal conduct of management and the board of directors, attitudes toward risk, and positions, which may be conservative or aggressive (e.g., position on estimates, policy choices), and degree of formality (e.g., in a smaller family business, controls may be more informal), all of which sends a message to the organization. Personal indiscretion, lack of receptiveness to bad news, or unfairly balanced compensation practices could impact the culture and ultimately provide an incentive for inappropriate conduct. In contrast, a history of ethical and responsible behavior by management and the board of directors and demonstrated commitment to addressing misconduct send strong messages in support of integrity. Employees are likely to develop the same attitudes about right and wrong—and about risks and controls—as those shown by management. Individual behavior is often influenced by the

knowledge that the chief executive officer has behaved ethically when faced with a tough business-based or personal decision, and that all managers have taken timely action to address misconduct.

61.     Tone at the top and throughout the organization is fundamental to the functioning of an internal control system. Without a strong tone at the top to support a strong culture of internal control, awareness of risk can be undermined, responses to risks may be inappropriate, control activities may be ill defined or not followed, information and communication may falter, and feedback from monitoring activities may not be heard or acted upon.

62.     The board of directors ultimately holds the chief executive officer accountable for understanding the risks faced by the entity and establishing the requisite system of internal control to support the achievement of the entity's objectives. The chief executive officer and senior management, in turn, are responsible for designing, implementing, conducting, and periodically assessing the structures, authorities, and responsibilities needed to establish accountability for internal control at all levels of the organization.

63.     The Company's annual report for fiscal year 2022, filed on Form 10-K on February 28, 2023, disclosed that management had assessed its disclosure controls and procedures as well as its internal control over financial reporting as effective as of December 31, 2022. James River's auditor, Ernst & Young, also expressed an unqualified (i.e., clean) opinion on the Company's internal control over financial reporting.

64.     The Q1 and Q2 2023 Forms 10-Q both state that "There were no changes in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during our quarter ended March 31, [June 30,] 2023 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting." However, James River's November 8, 2023 Form 8-K acknowledged that there was a

material weakness in the Company's internal control over financial reporting, which meant that its disclosure controls and procedures as well as its internal control over financial reporting were, in fact, not effective during the first two quarters of 2023:

> The Company's control over the review of the determination of when reinstatement premiums for reinsurance should be recognized did not operate effectively as of March 31, 2023 and June 30, 2023 resulting in a material weakness in the Company's internal control over financial reporting. Based on this assessment, the Company's disclosure controls and procedures were ineffective in the first and second quarter of 2023.

65.     According to James River's 2022 Form 10-K "management is responsible for establishing and maintaining adequate internal control over financial reporting."[4] The Individual Defendants' SOX certifications acknowledge their direct responsibility for establishing and maintaining disclosure controls and procedures and internal control over financial reporting. Moreo, the COSO framework, which James River used assessing the effectiveness of its internal control over financial reporting, also places the responsibility for establishing and maintaining internal control on the Company's senior management.

66.     As the CWs recall, the Company's senior management took no action to remedy its out of date accounting system or ensure that it had appropriate reserving practices. As a result, the Individual Defendants failed to set the tone at the top that would have enabled effective internal controls.

## E.    False and Misleading Statements During the Class Period

67.     The Class Period begins on May 2, 2023, when James River issued a press release announcing financial results for the first quarter of 2023. On the next day, James River filed its Form 10-Q with the SEC reporting its financial and operational results for the first quarter of 2023

---

[4] 2022 Form 10-K, page 105.

(the "1Q23 10-Q"). Defendants D'Orazio and Doran signed the 1Q23 10-Q, appending their signed SOX certifications attesting to the accuracy of the financial statements and that all fraud and significant deficiencies and material weaknesses in internal controls were disclosed.

68.     The May 2, 2023, press release and the 1Q23 10-Q included several materially false and misleading financial disclosures. The Company reported that its total revenues were $235.601 million, income before taxes was $12.744 million, net income was $9.608 million, net income available to common shareholders was $6.983 million, diluted earnings per share was $0.18, $139.934 million was payable to reinsurers, total liabilities were $4.469274 billion, the Company had a retained deficit of $146.993 million, and there was $590.915 million in shareholder equity. In the E&S segment specifically, James River reported $151.359 million in net earned premiums, $166.650 million in revenues, and $19.995 million in underwriting profits.

69.     The foregoing disclosures were materially false and misleading. In violation of GAAP, Defendants knew and/or recklessly disregarded that they had improperly accounted for reinsurance premiums. In fact, total revenues were $232.671 million, income before taxes was $9.814 million, net income was $7.006 million, net income available to common shareholders was $4.381 million, diluted earnings per share was $0.12, $142.864 million was payable to reinsurers, total liabilities were $4.472204 billion, the Company had a retained deficit of $149.595 million, and there was $588.313 million in shareholder equity. In the E&S segment, James River actually had $148.429 million in net earned premiums, $163.720 million in revenues, and $17.065 million in underwriting profits.

70.     The 1Q23 10-Q additionally stated that there were no changes in the Company's internal control over financial reporting that occurred during its quarter ended March 31, 2023 that

had materially affected, or were reasonably likely to materially affect, the Company's internal control over financial reporting.

71.    The foregoing statement was materially false and misleading. Defendants knew and/or recklessly disregarded that James River did not have effective internal control over financial reporting as of March 31, 2023 due to an ineffective accounting system and improper reserve practices, which Defendants had never disclosed.

72.    On August 7, 2023, James River announced its second quarter 2023 financial results in a press release. The next day, the Company filed its Form 10-Q with the SEC reporting its financial and operational results for the quarter ended June 30, 2023 ("2Q23 10-Q"). Defendants D'Orazio and Doran signed the 2Q23 10-Q, appending their signed SOX certifications attesting to the accuracy of the financial statements and that all fraud and significant deficiencies and material weaknesses in internal controls were disclosed.

73.    The August 7, 2023, press release and the 2Q23 10-Q included several materially false and misleading financial disclosures. The Company reported that its total revenues were $238.442 million, income before taxes was $31.014 million, net income was $23.693 million, net income available to common shareholders was $21.068 million, diluted earnings per share was $0.54, $170.004 million was payable to reinsurers, total liabilities were $4.555049 billion, the Company had a retained deficit of $127.844 million, and there was $595.923 million in shareholder equity. In the E&S segment specifically, James River reported $159.002 million in net earned premiums, $175.521 million in revenues, and $19.433 million in underwriting profits.

74.    The foregoing disclosures were materially false and misleading. In violation of GAAP, Defendants knew and/or recklessly disregarded that they had improperly accounted for reinsurance premiums. In fact, total revenues were $229.051 million, income before taxes was

$21.623 million, net income was $15.914 million, net income available to common shareholders was $13.289 million, diluted earnings per share was $0.35, $182.325 million was payable to reinsurers, total liabilities were $4.565430 billion, the Company had a retained deficit of $138.225 million, and there was $585.542 million in shareholder equity. In the E&S segment, James River actually had $149.611 million in net earned premiums, $166.130 million in revenues, and $10.042 million in underwriting profits.

75.    The 2Q23 10-Q additionally stated that there were no changes in its internal control over financial reporting that occurred during James River's quarter ended June 30, 2023 that had materially affected, or were reasonably likely to materially affect, the Company's internal control over financial reporting.

76.    The foregoing statement was materially false and misleading. Defendants knew and/or recklessly disregarded that James River did not have effective internal control over financial reporting as of March 31, 2023 due to an ineffective accounting system and improper reserve practices, which Defendants had never disclosed.

**F.    The Truth Emerges**

77.    On November 7, 2023, after the market closed, the Company disclosed in a press release announcing its third quarter 2023 financial results that it had "identified an error in the accounting for reinstatement premium . . . in its Excess & Surplus Lines segment" in the previously issued financial statements for the second quarter of 2023. More, the Company stated, it had identified a material weakness in its internal control over financial reporting because the "Company's control over the review of the determination of when reinstatement premiums for reinsurance should be recognized did not operate effectively[.]"

78.    Following these disclosures, the Company's stock price fell price fell $5.30, or 37.5%, to close at $8.44 on November 9, 2023, on unusually heavy trading volume.

79.     On November 14, 2023, James River filed the Restatement, admitting that it had recorded $2.9 million in first quarter 2023 reinstatement premiums and $9.4 million in second quarter 2023 reinstatement premiums one quarter too late, respectively. While the Company described the impact of the error in the first quarter of 2023 as "immaterial," it exceeded the quantitative materiality threshold of 5% in relation to both income and diluted earnings per share (the latter, in excess of 50%). Defendants admitted that the impact of the error in the second quarter was material to investors.

80.     The Restatement also admitted that material weaknesses existed in the Company's internal controls over financial reporting during the first two quarters of 2023, rendering them ineffective. Specifically, the Company stated that it had recognized reinstatement premiums for reinsurance at the wrong time. In determining whether it owed reinstatement premium on one of its treaties, the Company found that the liability for the reinstatement premium payable on three claims was recorded in a subsequent quarter of 2023 from the quarter in 2023 when the incurred losses that triggered the reinstatement premiums were recorded. Management's control did not operate as designed to identify that claims incurred on the 2020 and 2021 years of an excess of loss reinsurance treaty resulted in the initial coverage limit being exhausted and the need to record an accrual for reinstatement premium to reflect the cost of additional reinsurance coverage. Instead, claims paid on the reinsured policies were used in the calculation, which indicated that the initial coverage limits had not yet been exhausted.

## V.    PLAINTIFF'S CLASS ACTION ALLEGATIONS

81.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the Class, consisting of all those who purchased or otherwise acquired the publicly traded common stock of James River during the Class Period, and who were damaged thereby. Excluded from the Class are Defendants herein, the officers and

directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

82.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's common stock actively traded on Nasdaq. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action using the form of notice similar to that customarily used in securities class actions.

83.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

84.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

85.    Common questions of law and fact exist as to all members of the Class predominate over any questions solely affecting individual members. Among the questions of law and fact common to the Class are:

a.    whether Defendants' acts as alleged violated the federal securities laws;

b.      whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

c.      whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d.      whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

e.      whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

f.      whether the prices of the Company's common stock during the Class Period was artificially inflated because of the Defendants' conduct complained of herein; and

g.      whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

86.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VI.     APPLICATION OF PRESUMPTION OF RELIANCE; FRAUD ON THE MARKET

87.     Plaintiff will rely on the presumption of reliance established by the fraud on the market doctrine. At all relevant times, the market for James River's common stock was open, well-developed, and efficient. As a result of Defendants' materially false and/or misleading statements

and/or failures to disclose, James River's common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired the Company's common stock relying upon the integrity of the market price of James River's common stock and market information relating to James River, and have been damaged thereby.

88.    During the Class Period, the artificial inflation of James River's stock was caused by the material misrepresentations and/or omissions particularized in this Amended Complaint, causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about James River's internal controls and financial results. These material misstatements and/or omissions created an unrealistically positive assessment of James River and its business, operations, and revenue, thus causing the price of the Company's common stock to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company's common stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at such artificially inflated prices, and each of them has been damaged as a result.

89.    At all relevant times, the market for James River's common stock was an efficient market for the following reasons, among others:

a.    James River common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b.    As a regulated issuer, James River filed periodic public reports with the SEC and/or the NASDAQ;

c.    James River regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press

releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

d.    James River was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

e.    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

90.    As a result of the foregoing, the market for James River's common stock promptly digested current information regarding James River from all publicly available sources and reflected such information in James River's stock price. Under these circumstances, all purchasers of James River's common stock during the Class Period suffered similar injury through their purchase of James River's common stock at artificially inflated prices and a presumption of reliance applies.

91.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial results and prospects— information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.

Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## VII.    COUNTS

### COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Against All Defendants

92.    Plaintiff repeats and reallege each and every allegation contained above as if fully set forth herein.

93.    This Count is asserted against each of the Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

94.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase James River's common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

95.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for James River's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

96.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about James River's business operations and financial results and prospects, as specified herein.

97.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of James River's revenue, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about James River and its business operations and financial results and prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

98.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's revenue recognition practices, financial results, and reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants

was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

99.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing James River's actual business operation practices and revenues from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's revenues and business operations throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

100.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of James River's common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired James River's common stock during the Class Period at artificially high prices and were damaged thereby.

101.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding James River's internal controls and their impact on its financial reports, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their James River common stock, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

102.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

103.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

104.    The Individual Defendants acted as controlling persons of James River within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their participation in and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to

be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

105.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the internal control failures giving rise to the securities violations as alleged herein, and exercised the same.

106.    As set forth above, James River and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## VIII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## IX.   DEMAND FOR TRIAL BY JURY

107.   Plaintiff hereby demands a trial by jury.

Dated: May 24, 2024                    Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

*/s/ Jacob A. Goldberg*
Jacob A. Goldberg
Leah Heifetz-Li
101 Greenwood Avenue
Suite 440
Jenkintown, PA 19046
Tel: (215) 600-2817
Fax: (212) 202-3827
Email: jgoldberg@rosenlegal.com
         lheifetz@rosenlegal.com

*Lead Counsel for Lead Plaintiff and the Class*