```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  1/23/2025
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
:
PAUL GLANTZ, *individually and on behalf of* :
*all others similarly situated*, :
:
                                  Plaintiff, :         23-cv-10000 (LJL)
:
                 -v- :         OPINION AND ORDER
:
JAMES RIVER GROUP HOLDINGS, LTD., :
FRANK N. D'ORAZIO, and SARAH C. :
DORAN, :
:
                                  Defendants. :
:
-------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

Defendants Frank N. D'Orazio ("D'Orazio"), Sarah C. Doran ("Doran" and with D'Orazio, "Individual Defendants") and James River Group Holdings, Ltd. ("James River" or the "Company" and, together with the Individual Defendants, "Defendants"), move, pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), to dismiss the amended complaint. Dkt. No. 21.

For the reasons that follow, Defendants' motion is granted.

## BACKGROUND

For purposes of this motion, the Court assumes the truth of the well-pleaded allegations of the amended complaint as supplemented by the documents incorporated by reference.

### A.    The Relevant Parties

James River is a holding company incorporated under the laws of Bermuda and doing business in Bermuda that owns and operates a group of specialty insurance companies. Dkt. No. 20 ¶¶ 14, 18. The group includes four reportable segments: Excess & Surplus ("E&S") Lines,

Specialty Admitted Insurance, Casual Reinsurance, and Corporate and Other. *Id.* ¶ 18. D'Orazio was the company's Chief Executive Officer ("CEO"). *Id.* ¶ 15. Doran was the Company's Chief Financial Officer ("CFO"). *Id.* ¶ 16.

Lead Plaintiff Madhav Ghimire ("Ghimire") is an individual who purchased 10,000 shares of James River stock on September 15, 2023. *Id.* ¶ 13; Dkt. No. 13-2.

### B.      James River's Accounting Issues and Statements

The case grows out of an error in James River's accounting for reinstatement premiums in its E&S lines segment, which it disclosed on November 7, 2023. Through James River Insurance Company ("JRIC") and its wholly-owned subsidiary James River Casualty Company, the E&S lines segment offers commercial excess and surplus lines liability and property insurance in every state of the United States, as well as in the District of Columbia, Puerto Rico, and the United States Virgin Islands. Dkt. No. 20 ¶ 18. The majority of James River's revenue comes from the E&S lines market. *Id.* ¶¶ 18, 50. E&S lines insurance, also known as surplus lines insurance, is a specialty market that covers risks that standard insurance carriers will not underwrite or price, such as that borne by businesses with high risks including businesses in the construction, building, roofing, and commercial transportation industries. *Id.* ¶ 19.

To limit the Company's exposure to potential losses, protect against the aggregation of several risks in a common loss occurrence, and provide additional capacity for growth, James River routinely purchases reinsurance for E&S lines. *Id.* ¶ 20. Through such reinsurance, James River transfers, or cedes, all or part of its exposure to the reinsurer in return for a portion of the premium. *Id.* When an insurer contracts for reinsurance under an "excess of loss" agreement, the reinsurer agrees to assume all or a portion of the ceding company's losses in excess of a specified amount in exchange for a negotiated portion of the premium. *Id.* When the insurer cedes a portion of its exposure through "quota share" reinsurance, the reinsurer assumes a specified percentage of

the ceding company's losses arising out of a defined class of business in exchange for a corresponding percentage of the premiums. *Id.* Reinsurance, however, is not static. Reinsurance contracts often include a provision that requires the ceding company to pay an additional premium to reinstate the initial coverage purchased each time the coverage is "used up" by a loss. *Id.* ¶ 21.

Under Generally Accepted Accounting Principles ("GAAP"), an insurance company is required to disclose, either on the income statement or in the notes to the financial statements, the amounts of premiums from direct business and reinsurance premiums ceded (on both a written basis and an earned basis) and recoveries recognized under reinsurance contracts. *Id.* ¶ 34. Premiums paid to reinsurers are presented as a reduction in premium revenues attributable to direct insurance written while the reinsurance benefit is presented as a reduction in claims expense. *Id.* GAAP directs how the insurer is to account for a short-duration insurance or reinsurance contract with a retrospective rating provision, in which events in one period of the contract create rights and obligations in another. *Id.* ¶ 35. Upon a loss event when the reinstatement premium is obligatory, the ceding insurer recognizes a liability to the extent that the ceding insurer has an obligation to pay cash or other consideration to the reinsurer that would not have been required absent the loss experience to date. *Id.* ¶ 36. Furthermore, the ceding insurer must recognize the entire additional reinstatement premium as an immediate expense. *Id.*

On November 7, 2023, after the market closed, James River issued a press release announcing its third quarter 2023 financial results and stating that it had "identified an error in the accounting for reinstatement premium . . . in its Excess & Surplus Lines segment" in the previously issued financial statements for the second quarter of 2023. *Id.* ¶¶ 3, 77. The Company also stated that it had identified a material weakness in its internal controls over financial reporting because the "Company's control over the review of the determination of when reinstatement premiums for

reinsurance should be recognized did not operate effectively." *Id*.  The Company announced "[i]n determining whether the Company owed reinstatement premium on one of its treaties, the Company found that the liability for the reinstatement premium payable on three claims was recorded in a subsequent quarter of 2023 from the quarter in 2023 when the incurred losses that triggered the reinstatement premium were recorded. . . . A similar error occurred in the three months ended March 31, 2023." *Id.* ¶ 38.  James River filed a Form 8-K with the United States Securities and Exchange Commission ("SEC") on November 8, 2023.  *Id.* ¶ 40.  In the Form 8-K, James River stated in relevant part:

> In preparing its Quarterly Report on Form 10-Q for the period ended September 30, 2023, management of the Company identified an error in the accounting for reinstatement premium on a specialty casualty reinsurance treaty in its Excess & Surplus Lines segment (the "Reinstatement Premium") in the Company's previously issued condensed consolidated financial statements as of and for the three and six months ended June 30, 2023 (the "Prior Financial Statements"). Certain of the Company's reinsurance treaties include a requirement to pay additional reinsurance premiums after the initial coverage limit has been exhausted. In determining whether the Company owed reinstatement premium on one of its treaties, the Company found that the liability for the reinstatement premium payable on three claims was recorded in a subsequent quarter of 2023 from the quarter in 2023 when the incurred losses that triggered the reinstatement premiums were recorded.  This error resulted in understatements of ceded written premium, and overstatements of net written premium and net earned premium of $9.4 million and $12.3 million for the three and six months ended June 30, 2023, respectively, and overstatements of net income of $7.8 million and $10.4 million for the three and six months ended June 30, 2023, respectively, within the condensed consolidated statements of income and comprehensive income (loss), as well as corresponding effects on the condensed consolidated balance sheet and condensed consolidated statements of changes in shareholders' equity as of and for the three and six months ended June 30, 2023 in the original Quarterly Report on Form 10-Q for such period filed with the U.S. Securities and Exchange Commission on August 8, 2023 (the "Original Filing").  A similar error occurred in the three months ended March 31, 2023, which was deemed immaterial.

*Id.*  The Company further stated:

> The Company's management has assessed the effect of the foregoing on the Company's internal control over financial reporting and disclosure controls and procedures.  The Company's control over the review of the determination of when reinstatement premiums for reinsurance should be recognized did not operate

4

>effectively as of March 31, 2023 and June 30, 2023 resulting in a material weakness in the Company's internal control over financial reporting. Based on this assessment, the Company's disclosure controls and procedures were ineffective in the first and second quarter of 2023.

*Id.* After the November 7, 2023 disclosure, the Company's stock price fell 37.5% to close at $8.44 on November 9, 2023, on "unusually heavy" trading volume. *Id.* ¶¶ 4, 78.

On November 14, 2023, James River filed an amendment on Form 10Q/A with the SEC ("Restatement"), restating its financial statements as of June 30, 2023, and for the three- and six-month periods then ended. *Id.* ¶ 5. James River stated in the Form 10Q/A that it had recorded $2.9 million in Q1 2023 reinstatement premiums and $9.4 million in Q2 2023 reinstatement premiums one quarter too late, respectively. *Id.* ¶¶ 5, 79. James River's overstatements of its income before taxes, net income, and diluted earnings per share during the second quarter of 2023 each exceeded 40%. *Id.* ¶¶ 5, 79–80. The Company did not restate its results for the first quarter of 2023. *Id.* ¶ 5.

Plaintiff alleges that the following press releases and reports containing James River's financial results were false and misleading as a result of the accounting error: (1) James River's May 2, 2023 press release announcing its financial results for the first quarter of 2023; (2) James River's Form 10-Q reporting its financial and operational results for the first quarter of 2023; (3) James River's August 7, 2023 press release announcing its second quarter 2023 financial results; and (4) James River's August 8, 2023, quarterly report filed on Form 10-Q announcing its financial and operational results for the quarter ended June 30, 2023. *Id.* ¶¶ 67–76. According to Plaintiff, James River's disclosures improperly accounted for reinsurance premiums. *Id.* ¶¶ 69, 74. The disclosures also falsely and misleadingly stated that there were no changes in the Company's internal control over financial reporting that had materially affected, or were reasonably likely to materially affect, the Company's internal control over financial reporting,

5

whereas Defendants knew or recklessly disregarded that James River did not have effective internal controls over financial reporting due to its ineffective accounting system and improper reserve practices. *Id.* ¶¶ 71, 76.

Plaintiff brings this action on behalf of all persons and entities that purchased or otherwise acquired James River common stock between May 2, 2023, and November 7, 2023, inclusive (the "Class Period"). *Id.* ¶¶ 2, 81.

        C.        **Allegations of Scienter**

The complaint relies, in part, on information provided by four confidential witnesses ("CWs"), each of whom worked for JRIC, the Company's E&S line subsidiary, but only one of whom was employed after May 2023. CW-1 was the senior accounting manager at JRIC from July 2022 to December 2022 and reported to the Assistant Controller. *Id.* ¶ 24 & n.1. CW-1 stated that JRIC used several different ledger systems instead of one general ledger system and, as a result, JRIC did not have a single database set with all premium amounts available to its accounting function. *Id.* ¶ 24. She explained that without the ability to access all lines of business, financial statements would be incorrect. *Id.* CW-2 was the senior premium auditor for JRIC from October 2022 to July 2023 and confirmed CW-1's statement that the underwriting data was not connected to the accounting system. *Id.* ¶ 25. According to CW-2, the accounting system was "antiquated and slow." *Id.* CW-4 joined JRIC as claims liability manager in November 2022 and was employed through March 2024, reporting to the AVP of complex claims. *Id.* ¶¶ 27–28. CW-4's role included overseeing claims examiners and handlers and reviewing coverage, letters, authority, and large loss reports. *Id.* ¶ 28. CW-4 stated that there was a major backlog of New York Labor Law claims, and many were "grossly under reserved." *Id.* CW-4 described the environment at James River Insurance Company as lacking in communication, engagement, and consistency, and recalled that the AVP would improperly reject claims, resulting in third-party actions and

declaratory judgments against JRIC. *Id.* CW-3 was employed as the New York Labor Law complex claims specialist for JRIC from September 2022 through March 2023 and reported to the AVP of complex claims and then to CW-4. *Id.* ¶ 27. CW-3 was hired to resolve a backlog of hundreds of New York Labor Law claims which were multi-million dollar several-layer exposures, most of which had only a $5,000 reserve on them even though they were usually worth at least $1 million. *Id.* As a result, CW-3 believed that the Company did not adequately reserve for its claims. *Id.* She also stated that the AVP would often deny claims in bad faith and told CW-3 never to communicate directly with the underwriting function. *Id.*

## PROCEDURAL HISTORY

This case was initiated by complaint filed on November 13, 2023. Dkt. No. 1.

On March 25, 2024, the Court entered an order approving Ghimire's motion to serve as Lead Plaintiff and appointing The Rosen Law Firm, P.A., to serve as Lead Counsel under the Private Securities Litigation Reform Act ("PSLRA"). Dkt. No. 17.

Plaintiff filed the amended complaint on May 24, 2024. Dkt. No. 20. The amended complaint asserts claims against all Defendants for violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, promulgated thereunder, and against D'Orazio and Doran for control person liability under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). *Id.*

On July 23, 2024, Defendants filed the instant motion to dismiss along with a memorandum of law and a declaration of counsel in support of the motion. Dkt. Nos. 21–23. Plaintiff filed a memorandum of law and a declaration of counsel in opposition to the motion on September 6, 2024. Dkt. Nos. 24–25. On October 8, 2024, Defendants filed a reply memorandum of law in further support of the motion. Dkt. No. 26.

**LEGAL STANDARD**

On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a court must accept as true all factual allegations in the complaint and draw all possible inferences from those allegations in favor of the plaintiff. *See Rombach v. Chang*, 355 F.3d 164, 169 (2d Cir. 2004). This requirement "is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

A complaint must offer more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" or "naked assertion[s]" devoid of "further factual enhancement" in order to survive dismissal. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The ultimate question is whether "[a] claim has facial plausibility, [*i.e.*,] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011) (same).

"The [PSLRA] imposes additional requirements on a plaintiff bringing a private securities fraud action." *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 381 (S.D.N.Y. 2020), *aff'd*, 847 F. App'x 35 (2d Cir. 2021). As relevant here, the PSLRA imposes a heightened pleading standard for scienter, such that a "complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308,

8

324 (2007). When determining whether a strong inference of scienter exists, the facts alleged must be "taken collectively" rather than viewed independently or in isolation. *Id.* at 323.

The parties dispute which documents the Court may consider on the motion to dismiss. Defendants append the following exhibits to their motion to dismiss: (A) James River's Form 10-K, filed on February 29, 2024; (B) a James River press release dated April 16, 2024 and entitled "James River Completes Sale of Casualty Reinsurance Business to Flemings Holdings; (C) James River's Form 10-Q/A filed on November 14, 2023; (D) James River's Form 8-K filed on November 8, 2023; (E) James River's press release, dated November 7, 2023, and entitled "James River Announces Third Quarter 2023 Results"; (F) James River's historical stock prices from Yahoo Finance; (G) a James River press release dated November 8, 2023, entitled "James River Announces Agreement to Sell Casualty Reinsurance Business to Flemings Holdings"; (H) an equity research report on James River by Keefe, Bruyette & Woods, dated November 8, 2023; (I) an equity research report on James River by Barclays, dated November 8, 2023; and (J) an equity research report on James River by Barclays, dated November 9, 2023. Plaintiff objects to the Court's consideration of any of Defendants' exhibits on the motion to dismiss.

Plaintiff's objection is ill-founded with respect to exhibits C, D, and E. Those documents are referred to and quoted in the amended complaint, which relies upon them for their contents. Dkt. No. 20 ¶¶ 3, 5, 37–38, 40–41, 77, 79–80. They are therefore deemed incorporated by reference such that the Court may consider the documents for their contents and the fact that they were filed, but not for their truth. *See In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 238–39 (S.D.N.Y. 2023); *Gray*, 454 F. Supp. 3d at 382–83. The Court may also take judicial notice of Exhibit F, which contains James River's "well publicized stock prices." *Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 692 F.3d 34, 37 n.1 (2d Cir. 2012); *see also In re China Organic Sec.*

9

*Litig.*, 2013 WL 5434637, at *8 (S.D.N.Y. Sept. 30, 2013) (taking judicial notice of stock prices published on Yahoo Finance); *U.S. Sec. & Exch. Comm'n v. Passos*, 2024 WL 5203022, at *7 (S.D.N.Y. Dec. 21, 2024) (same). However, Plaintiff's objection is well-founded with respect to exhibits A, B, G, H, I, and J. Those documents are neither referenced in, nor appended to, the amended complaint and they are not susceptible to judicial notice. The Court therefore does not consider those documents in deciding the motion to dismiss.

## DISCUSSION

To plead a claim for damages under Section 10(b) of the Exchange Act and Securities and Exchange Commission Rule 10b–5(b), a plaintiff must satisfy each of the following six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) (citation omitted); *see Matrixx*, 563 U.S. at 37–38; *Waggoner v. Barclays PLC*, 875 F.3d 79, 93 n.23 (2d Cir. 2017).

Defendants argue that the amended complaint should be dismissed because Plaintiff does not allege particularized facts supporting a strong inference of scienter. Dkt. No. 22 at 11–23; Dkt. No. 26 at 2–10. Defendants also argue that, because the complaint does not allege a primary violation of Section 10(b) of the Exchange Act or Rule 10b-5 promulgated thereunder, Plaintiff's Section 20(a) claims must be dismissed as well. Dkt. No. 22 at 23; Dkt. No. 26 at 10.

### I.     Scienter

"The requisite state of mind, or scienter, in an action under section 10(b) and Rule 10b–5, that the plaintiff must allege is 'an intent to deceive, manipulate or defraud.'" *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (quoting *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 168 (2d Cir. 2000)). "A plaintiff may establish scienter by alleging facts that either (1) show that the

10

defendant had both the 'motive and opportunity' to commit the alleged fraud, or (2) constitute 'strong circumstantial evidence of conscious misbehavior or recklessness.'" *Francisco v. Abengoa, S.A.*, 559 F. Supp. 3d 286, 317 (S.D.N.Y. 2021) (quoting *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009)); *see also Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000) ("A strong inference of scienter "may arise where the complaint sufficiently alleges that the defendants: (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor.").

"When the defendant is a corporate entity, . . . the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 195 (2d Cir. 2008). "[I]t is possible to plead corporate scienter by pleading facts sufficient to create a strong inference either (1) that 'someone whose intent could be imputed to the corporation acted with the requisite scienter' or (2) that the statements 'would have been approved by corporate officials sufficiently knowledgeable about the company to know' that those statements were misleading." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015) (quoting *Dynex Cap.*, 531 F.3d at 195–96).

Plaintiff does not argue that the Individual Defendants or any individual whose intent could be imputed to James River acted with the motive and opportunity to commit fraud. *See* Dkt. No. 24 at 10.[1] However, "the absence of a motive allegation is not fatal." *Tellabs*, 551 U.S. at 325.

---

[1] Plaintiff did not respond to Defendants' argument that the amended complaint offers no allegation of motive. Dkt. No. 22 at 11–13. Accordingly, the claim that Defendants acted with the motive and opportunity to commit fraud is deemed abandoned. *See Jackson v. Federal*

11

"Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." *Kalnit*, 264 F.3d at 142.

Plaintiff argues that it adequately pleads James River's reckless misbehavior or consciousness (1) "because the E&S lines segment was James River's core business and the Individual Defendants stated to investors that they had designed and implemented controls with no material weaknesses," and (2) because the CW's statements regarding "management of the finance and claims functions at JRIC" show that the Company failed to maintain "a usable, integrated accounting system capable of producing accurate financial statements and . . . to properly reserve for claims, respectively." Dkt. No. 24 at 11–16.  Viewed in the aggregate, Plaintiff's allegations fail to raise the required strong inference of scienter.

Plaintiff does not allege any other facts sufficient to establish that anyone whose intent could be imputed to James River acted with the intent to defraud.  Scienter can be pled by allegations that "defendants . . . had access to non-public information contradicting their public statements." *Wilbush v. Ambac Fin. Grp., Inc.*, 271 F. Supp. 3d 473, 485 (S.D.N.Y. 2017) (quoting *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001)).  "[W]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Dynex Cap.*, 531 F.3d at 196  (quoting *Novak*, 216 F.3d at 309).[2]  Plaintiff's amended complaint is devoid of allegations of specific facts, reports, statements, or

---

*Express*, 766 F.3d 189, 196 (2d Cir. 2014).  Regardless, Plaintiff acknowledges "[t]he absence of motive."  Dkt. No. 24 at 10.

[2] "As the courts have made clear, contrary facts may also be learned in other ways, including through observation." *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 237 (S.D.N.Y. 2022) (citing *In re Aphria, Inc. Sec. Litig.*, 2020 WL 5819548, at *9 (S.D.N.Y. Sept. 30, 2020)).

observations to which the Individual Defendants had access, and which contained information contrary to James River's public disclosures. *See id.*; *In re Turquoise Hill*, 625 F. Supp. 3d at 236–38; *Pirnik v. Fiat Chrysler Autos., N.V.*, 2017 WL 3278928, at *3 (S.D.N.Y. Aug. 1, 2017).

The allegation that James River restated its financial results cannot alone provide the requisite strong inference of scienter. Companies may restate their financial results because they have made a mistake as well as because they have acted recklessly or intentionally. GAAP requires the company to report any material error in the financial statements of a prior period discovered after the financial statements are issued as an error correction by restating the prior-period financial statements, including errors resulting from mathematical mistakes, mistakes in the application of GAAP, or the oversight or misuse of facts that existed at the time the financial statements were prepared. Dkt. No. 20 ¶¶ 42–43, 46. A sufficiently large write-off or restatement can contribute to an inference of scienter, *see, e.g.*, *In re Scholastic*, 252 F.3d at 77; *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000); *see also Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 544, 551–53 (S.D.N.Y. 2017), but it cannot alone establish scienter, *see Chapman v. Mueller Water Prod., Inc.*, 466 F. Supp. 3d 382, 413–14 (S.D.N.Y. 2020); *Wyche v. Advanced Frainage Sys., Inc.*, 2017 WL 971805, at *16 (S.D.N.Y. Mar. 10, 2017) (citing *Rothman*, 220 F.3d at 90, 92), *aff'd*, 710 F. App'x 471 (2d Cir. 2017). Such a restatement will suffice to show scienter only "where there is something about the write-off or restatement that supports the inference that the defendants knew information contradicting their public statements." *Chapman*, 466 F. Supp. 3d at 414. Without more, a defendant's mere ignorance of "the extent of the Company's accounting improprieties" does not rise to the level of recklessness. *Wyche*, 2017 WL 971805, at *16; *see also id.* ("[A]llegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim." (quoting *S.E.C. v. Espuelas*, 579 F. Supp. 2d 461,

474 (S.D.N.Y. 2008)); *see also In re Lottery.com, Inc. Sec. Litig.*, 715 F. Supp. 3d 506, 547 (S.D.N.Y. 2024) (citing *Novak*, 216 F.3d at 309).

Plaintiff argues that scienter should be inferred because of the Individual Defendants' personal roles in designing and evaluating the Company's internal controls.  Dkt. No. 24 at 11.  Indeed, such personal involvement may give rise to a finding of scienter where the corporate actor's role makes them aware of information contradicting the company's public statements.  *See, e.g.*, *Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 247–48 (S.D.N.Y. 2012) ("[I]n light of the personal involvement of [the CFO] in designing and evaluating [the company's] internal controls, the stark realities about the inadequacies of the internal controls that were revealed in the March 2011 restatement, the audit delays and control deficiencies expressly raised to him during the class period, and the fact that the Tax Department uniquely was experiencing problems even while he knew that its functions were of specific importance to the Company, the amended complaint sufficiently alleges scienter with regard to his statements" including his internal controls certifications); *In re Scot. Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 395 (S.D.N.Y. 2007) ("[T]estimony from CWs that the Company's reporting systems were in such poor condition that it could not properly track unprocessed claims and that the individual in charge of maintaining financial reporting systems in the United States was dismissed in connection with these failures . . . sufficiently support the inference that defendants were reckless").

However, the amended complaint does not identify any information the Individual Defendants' personal roles would have elicited so as to give rise to an inference of scienter that could be imputed to the Company.  Plaintiff alleges that management assessed the disclosure controls and procedures of James River as well as its internal control over financial reporting as effective as of December 31, 2022, Dkt. No. 20 ¶ 63, and that the Company's first and second

quarter 2023 Form 10-Qs indicated that there were no changes in the internal control over financial reporting that would have materially affected, or were reasonably likely to materially affect, the Company's internal control over financial reporting, *id.* ¶ 64. The Company's Form 10-K indicated that management was "responsible for establishing and maintaining adequate internal control over financial reporting" and the Individual Defendants' SOX certifications acknowledge the direct responsibility of the Individual Defendants for establishing and maintaining disclosure controls and procedures and internal controls over financial reporting. *Id.* ¶ 65. But none of this indicates Individual Defendants' contemporary awareness of the internal controls failures. "[T]hese certifications typically 'add nothing substantial to the scienter calculus' because 'allowing Sarbanes-Oxley certifications to create an inference of scienter in every case where there was an accounting error . . . by a public traded company would eviscerate the pleading requirements for scienter set forth in the PSLRA.'" *Reilly v. U.S. Physical Therapy, Inc.*, 2018 WL 3559089, at *19 (S.D.N.Y. July 23, 2018) (quoting *Int'l Ass'n of Heat v. Int'l Bus. Machs. Corp.*, 205 F. Supp. 3d 527, 536 (S.D.N.Y. 2016)); *accord N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cnty. Ret. Ass'n v. MDC Partners, Inc.*, 2016 WL 5794774, at *22 (S.D.N.Y. Sept. 30, 2016) (Sullivan, J.). Plaintiff instead falls back on the fact that James River subsequently reported that it did not have effective controls over financial reporting during the Class Period. *Id.* ¶¶ 71, 76. But that argument rests on impermissible fraud-by-hindsight. *See Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978) (Friendly, J.). "[T]he Complaint does not adequately allege that the Defendants possessed actual knowledge of deficiencies in the Company's internal controls at the relevant time." *In Re Renewable Energy Grp. Sec. Litig.*, 2022 WL 14206678, at *2 (2d Cir. Oct. 25, 2022) (summary order).

Plaintiff invokes the "core operations" doctrine, arguing that scienter can be interred because of "the critical importance of the JRIC unit to James River's business." Dkt. No. 24 at 12–13. "Under the core operations doctrine, a court may infer that a company and its senior executives have knowledge of information concerning the core operations of a business, such as events affecting a significant source of income." *Plymouth Cnty. Ret. Ass'n v. Array Techs., Inc.*, 2023 WL 3569068, at *17 (S.D.N.Y. May 19, 2023) (quoting *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 423 (S.D.N.Y. 2020) (Nathan, J.)). The core operations doctrine, however, "has been thrown into doubt by the enactment of the PSLRA in 1995." *In re Turquoise Hill*, 625 F. Supp. 3d at 239; *see In re Rockwell Med., Inc. Sec. Litig.*, 2018 WL 1725553, at *14 (S.D.N.Y. Mar. 30, 2018) (Sullivan, J.). "As a result of these doubts as to the doctrine's continuing import, the core operations inference may be considered as part of a court's holistic assessment of the scienter allegations, but it is not independently sufficient to raise a strong inference of scienter." *In re Turquoise Hill*, 625 F. Supp. 3d at 239 (quoting *In re Rockwell Med.*, 2018 WL 1725553, at *14). Put differently, "core-operations allegations are 'supplementary'; that is, they are not 'independently sufficient means to plead scienter.'" *Saraf v. Ebix, Inc.*, 632 F. Supp.3d 389, 398 (S.D.N.Y. 2022) (citation omitted). Where Plaintiff's other allegations fall short of supporting a compelling inference of scienter, allegations that a misstatement affected a core operation generally cannot fill the gap. *See In re AppHarvest*, 684 F. Supp. 3d at 246; *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 353 (S.D.N.Y. 2011) (Sullivan, J.).

Even when viewed as "supplementary but not independently sufficient means to plead scienter," *In re Wachovia*, 753 F. Supp. 2d at 353, Plaintiff's core operations allegations still fall short. Plaintiff alleges that the E&S segment was the Company's largest segment, accounting for

16

61.5% of its gross written premiums and 78.7% of its net written premiums for the year ended December 31, 2022.  Dkt. No. 20 ¶ 50.  The question here, however, is not whether the E&S segment was a core operation, but whether E&S's reinsurance recording itself was a core operation.  *See Bd. of Trs. of City of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 872–73 (S.D.N.Y. 2011) (Sullivan, J.), *aff'd sub nom. Frederick v. Mechel OAO*, 475 F. App'x 353 (2d Cir. 2012); *In re Wachovia*, 753 F. Supp. 2d at 358.  And Plaintiff has not sufficiently alleged that James River's reinsurance business was "sufficiently core" to its business that the accounting error would have been apparent to the Individual Defendants.  *See In Re Renewable Energy Grp. Sec. Litig.*, 2022 WL 14206678, at *3 (2d Cir. Oct. 25, 2022); *Mechel OAO*, 811 F. Supp. 2d at 872–73.  Fundamentally, James River's core operation is insurance, not accounting for reinsurance.  *See Reilly*, 2018 WL 3559089, at *18 (citing *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 628 (S.D.N.Y. 2005)).

Plaintiff also relies, in large part, on the statements from the alleged confidential witnesses regarding the Company's accounting system and reserves.  The amended complaint, however, "provides no connective tissue between those employees and the alleged misstatements." *Jackson v. Abernathy*, 960 F.3d 94, 99 (2d Cir. 2020).  Two of the CWs assert that, during a period that primarily precedes the Class Period, the underwriting data at JRIC was not connected to the accounting system and that the company did not have a single general ledger with all premium amounts available to its accounting function.  Dkt. No. 20 ¶¶ 24–26.  Two other CWs make allegations regarding the Company's handling of claims under the New York Labor Law and assert that the Company did not adequately reserve for those claims and would frequently deny claims in bad faith.  *Id.* ¶¶ 27–29.  Plaintiff asserts that the amended complaint "pleads that the management of the finance and claims functions at JRIC acted with fraudulent intent by failing to

17

maintain a usable, integrated accounting system capable of producing accurate financial statements and by failing to property reserve for claims." Dkt. No. 24 at 13. There are numerous problems with these allegations. For one, there are no allegations that any of the CWs reported directly or indirectly to either Individual Defendant or anyone else whose intent could be imputed to James River. CW-1 reported to the Assistant Controller and CW-4 reported to the AVP of complex claims. Dkt. No. 20 ¶¶ 24–25 & n.1. There are no allegations where in the reporting structure those individuals fell or what involvement, if any, they had in the preparation of the statements alleged to be false or misleading. "Not one of these former employees indicates that he or she communicated his or her concerns to 'an Individual Defendant, let alone that they persuaded the defendants (or notified them of facts demonstrating) that the [accounting] was inadequate.'" *Wyche*, 2017 WL 971805, at *15 (quoting *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 299 (S.D.N.Y. 2013)); *see also Thomas v. Shiloh Indus., Inc.*, 2018 WL 4500867, at *4 (S.D.N.Y. Sept. 19, 2018) (noting that "the fact that an employee is not part of senior management weighs strongly against imputation"). "Nor did any Individual Defendant, or anyone acting at the direction of an Individual Defendant, request that any of the former employees engage in fraudulent conduct on the Company's behalf." *Wyche*, 2017 WL 971805, at *15.

Furthermore, there are no allegations how, if at all, the issues observed by the CWs relate to the error in financial statements which Plaintiff alleges constituted a misstatement. The amended complaint asserts that in two quarters in 2023, James River failed to record the reinstatement premium payable on three claims in connection with one of its treaties in the quarter when the incurred losses triggered such premium. Dkt. No. 20 ¶ 38. The CWs make claims regarding the general ledger and the payment of claims under the New York Labor Law. There are no allegations that the issues observed by any of the CWs resulted in a misstatement of the

financial statements. For all that appears from the amended complaint, the issue with respect to the reinsurance treaty and those with respect to the general ledger and the payment of New York Labor Law claims are unrelated. *See In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 581 (S.D.N.Y. 2014) ("Though the CWs offer their thoughts and opinions as to various quality issues experienced by the company prior to 2013, they do not establish what specific contradictory information the makers of the statements had and the connection (temporal or otherwise) between that information and the statements at issue."), *aff'd*, 604 F. App'x 62 (2d Cir. 2015).

Ultimately, Plaintiff's allegations fail to give rise to a strong inference of scienter. Defendant's motion to dismiss Plaintiff's claim for violation of Section 10(b) is therefore granted.

## II.     Control Person Liability

Because Plaintiff has failed to plead a primary violation of Section 10(b), the Section 20(a) claim against the Individual Defendants necessarily fails. *See Slayton v. Am. Exp. Co.*, 604 F.3d 758, 778 (2d Cir. 2010); *Rombach*, 355 F.3d at 178; *Chapman*, 466 F. Supp. 3d at 414.

## III.    Leave to Amend

Plaintiff requests that "[i]n the event the Court finds that any count of the Complaint fails to state a claim, Plaintiffs should be granted leave to amend." Dkt. No. 24 at 16 n.7. Defendants request that dismissal be with prejudice due to futility. Dkt. No. 26 at 10 n.4. "Although Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend 'shall be freely given when justice so requires,' it is within the sound discretion of the district court to grant or deny leave to amend." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) (quoting Fed. R. Civ. P. 15(a)). "A district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *Id.* Plaintiff has not "proffered the content of any proposed amendment or given any clue as to how the complaint's defects would be cured." *In re Skechers USA, Inc. Sec. Litig.*, 444 F. Supp. 3d 498,

19

530 n.19 (S.D.N.Y. 2020) (citation omitted). Plaintiff's failure to plead scienter does not appear to be the product of inartful pleading but rather a substantive issue that makes repleading futile. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000). The amended complaint is dismissed with prejudice.

## CONCLUSION

Defendants' motion to dismiss the amended complaint with prejudice is GRANTED.

The Clerk of Court is respectfully directed to close this case.

SO ORDERED.

Dated: January 23, 2025
      New York, New York

                                            LEWIS J. LIMAN
                                    United States District Judge